UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MARIO HURTADO-MEZA,                    )
                                       )
                    Plaintiff,         )
         v.                            )         Case No. 21-cv-2178
                                       )
NICK CANNATARO, *et al.*,              )
                                       )
                    Defendants.        )

<u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff filed a complaint under 42 U.S.C. § 1983 alleging that Defendants Nick Cannataro, Shannon Haggard, Funmi Adesina, Elisha Vasquez, Areidy Ramos, and Deliz Santiago were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment while he was detained at the Jerome Combs Detention Center ("JCDC"). Specifically, Plaintiff alleges that Defendants delayed insulin for his diabetes and failed to provide adequate medical care for a toe infection, which led to gangrene and a toe amputation. (Doc. 1).

This matter comes before the Court on Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1  (Doc. 23); Plaintiff's Response (Doc. 30); and Defendants' Reply (Doc. 31). For the reasons below, Defendants' Motion is GRANTED.

MATERIAL FACTS

*Parties*

At all relevant times, Plaintiff was a federal pretrial detainee at the JCDC.

1

Defendant Cannataro is a Physician's Assistant ("PA") at the JCDC. As an advanced care provider, other medical providers at the JCDC consult with him about patient care. (Doc. 23-5 at ¶¶ 2-3).

Defendant Haggard is a Nurse Practitioner ("NP") at the JCDC. As an advanced care provider, nursing staff consult with her regarding patient care. Defendant Haggard is qualified to enter orders for patient care, including prescriptions. (Doc. 23-6 at ¶ 2).

Defendants Adesina, Vasquez, and Ramos were registered nurses ("RN") at the JCDC. When faced with an issue outside their level of expertise, they consulted an advanced care provider, such as Defendants Cannataro and Haggard. (Doc. 23-8 at ¶¶ 1-3; Doc. 23-9 at ¶¶ 1-3; Doc. 23-10 at ¶¶ 1-3).

Defendant Santiago is a licensed practical nurse ("LPN") at the JCDC. (Doc. 23-7 at ¶ 2).

***Plaintiff's Medical History and Right Great Toe Injury Before Booking***

Plaintiff has Type 2 diabetes and takes oral medication twice daily and injectable medication in the morning and as needed throughout the day. (Doc. 23-1 at 8:18-23, 32:20-21).

About two or three weeks before arriving at the JCDC, Plaintiff cut the underside of both great toes on a grainy pool floor. *Id.* at 41-43. Plaintiff used a "Mexican antibiotic" called Flanax 500, put triple antibiotic ointment on the wounds, and covered the toes with gauze. *Id.* at 43-44. He did not see a medical provider. *Id.* at 43:13-14.

***Medical Care Provided by JCDC Medical Staff and Outside Providers***

Plaintiff was booked at the JCDC on August 25, 2020. *Id.* at 14:22-15:3. Plaintiff informed an RN that he was diabetic and took injectable insulin 70/30 and Metformin, an oral medication, 1000 mg twice daily. (Doc. 23-5 at ¶¶ 10-11).

Plaintiff admits that his A1c levels were high when he arrived at the JCDC and have improved dramatically over the course of his detainment. (Doc. 23-1 at 71; Doc. 23-5 at ¶ 8; Doc. 23-6 at ¶ 7). At the JCDC, Plaintiff has had chronic care follow up visits to monitor his diabetes with the advanced care provider, including daily blood sugar checks daily, monthly weight checks, and A1c checks every three months. (Doc. 23-1 at 35-38; Doc. 23-5 at ¶ 6).

According to Defendant Cannataro, detainees can bring in their own medication when booked at the JCDC, but the medication must be labeled with the prescription name and detainee's name and not show signs of contamination. *Id.* at ¶ 12. Plaintiff did not bring his medications with him; however, he provided information about his pharmacy. *Id.* at ¶ 10. The RN called the pharmacy to verify the prescriptions, but it was closed. *Id.* The JCDC has injectable insulin that can be administered to detainees, with the dose of insulin based on blood glucose level (a "sliding scale"), until the prescription can be verified, ordered, and received. *Id.* at ¶ 14.

A diabetes mellitus sheet was made and taken to the housing unit to log Plaintiff's blood sugar levels; instructions were given regarding insulin dosage; and snacks were provided to prevent low blood sugar. *Id.* at ¶ 10.

3

The U.S. Marshals Service ("USMS") must approve all prescription drugs, all visits to an outside medical provider, and all medical devices for federal detainees because the USMS ultimately bears some or all of the associated financial costs. (*Id.* at ¶¶ 7, 13; Doc. 23-6 at ¶ 6).

Plaintiff claims that Defendant Santiago told him his family did not need to bring his diabetes medication because he would receive his medication at the JCDC, and the USMS would sign off on it. (Doc. 23-1 at 19-20, 31). Defendant Santiago asserts that she did not see Plaintiff when he was booked and does not recall this conversation. (Doc. 23-7 at ¶¶ 7-8).

On August 26, 2020, Plaintiff refused all blood sugar checks except for the 11:00 a.m. check. From August 27 to August 29, 2020, he again refused all blood sugar checks except for the 11:00 a.m. check and received sliding scale insulin based on his blood glucose reading. (Doc. 23-5 at ¶ 15).

On August 28, 2020, Plaintiff was seen by Defendant Cannataro in the JCDC clinic. Plaintiff stated that he had been compliant with his diabetes medication at home, but he had not taken any medication in about a week. Defendant Cannataro ordered insulin, including Metformin 1000 mg, one tablet two times daily. He also ordered Novolog 70/30, which is injectable insulin, 50 units in the morning and 20 units in the evening. Plaintiff stated that he had very little sensation to the bottoms of his feet. Defendant Cannataro examined his feet and observed 1 cm dry wounds to both great toes. There was no sign of infection, such as swelling, drainage, or warmth. Defendant Cannataro

"ordered wound care daily to clean the wounds with normal saline and apply a padded bandage and instructed him to keep the wounds clean and dry." *Id.* at ¶ 16.

From August 28, 2020 to September 14, 2020, nursing staff provided daily wound care, including cleansing and new dressings. Plaintiff also received medication and blood glucose checks for his diabetes. *Id.* at ¶ 19.

On August 28, 2020, Defendant Adesina cleansed the wounds with saline, applied a bandage, and advised Plaintiff to keep the area clean and dry. (Doc. 23-8 at ¶ 5). The same day, a nurse reached Plaintiff's pharmacy and verified the prescriptions for his diabetes medication with the pharmacist. (Doc. 23-5 at ¶ 17). Plaintiff began receiving Metformin on August 29, 2020, and Novolog 70/30 on September 2, 2020. *Id.* at ¶ 18.

On September 1, 2020, Defendant Haggard was advised that Plaintiff's blood glucose level measured high and that he had not taken insulin that morning. She ordered him to be started on Novolin R per sliding scale three times a day with meals and that he be given 12 units of Novolin R now and have his blood sugar checked in two hours. She also ordered a diabetic diet. (Doc. 23-6 at ¶ 9).

When providing routine wound care on September 5, 2020, Defendant Ramos observed that Plaintiff's right great toe had redness and inflammation. Plaintiff reported feeling nerve shocks at night. Defendant Ramos spoke with Defendant Haggard, who ordered the oral antibiotic Clindamycin. (Doc. 23-10 at ¶ 8).

During daily wound care on September 6, 2020, Defendant Ramos observed no drainage, bleeding, or other signs of an infection. She cleansed the wound with normal saline and applied a new bandage. *Id.* at ¶ 9.

5

On September 7, 2020, Plaintiff requested pain medication for his wounds. Defendant Haggard prescribed Tylenol 1,000 mg to be taken twice daily as needed for ninety days. (Doc. 23-6 at ¶ 10).

When Defendant Adesina performed daily wound care on September 8, 2020, she observed that Plaintiff's right great toe was red and swollen. A follow-up appointment with an advanced care provider was scheduled for the next day. (Doc. 23-8 at ¶ 7).

On September 9, 2020, the nurse performing wound care consulted Defendant Haggard to evaluate Plaintiff's wound on his right great toe. Defendant Haggard observed that the toe was very red with whitish skin and yellow drainage. She entered a referral for wound care and for debridement at an outside clinic, which required approval from the USMS because Plaintiff is a federal detainee. Defendant Haggard ordered the continuation of wound care at the JCDC clinic in the meantime. She also ordered a uric acid test to check for gout, which can cause inflammation and redness to the great toe. (Doc. 23-6 at ¶ 11).

Defendant Adesina performed daily wound care on September 11, 2020, and noted Plaintiff's toe had some redness and swelling, but no drainage. (Doc. 23-8 at ¶ 8).

When Defendant Ramos performed wound care on September 12, 2020, Plaintiff did not have his bandage on. Defendant Ramos cleansed the wound and applied a clean bandage. She observed that his right great toe was red and swollen. Plaintiff was on antibiotics. Plaintiff reported he had a blister which popped that morning; Defendant Ramos cleansed the area and applied antibiotic ointment. (Doc. 23-10 at ¶ 10).

On September 13, 2020, Defendant Ramos observed during wound care that Plaintiff's right great toe had redness, inflammation, was warm to the touch, had skin peeling with white slough, and an odor. There was no drainage. His toe was cleansed with saline and bandaged. Defendant Ramos updated Defendant Haggard, who prescribed the antibiotic Augmentin 825/125 twice daily for fourteen days. Plaintiff was also waiting for USMS approval to see a wound care specialist. (Doc. 23-6 at ¶ 12; Doc. 23-10 at ¶ 11).

According to his medication administration record, Plaintiff received a Clindamycin dose on September 6 and 7, 2020. He did not receive it on September 8 and 9, 2020 due to it being out of stock. He started taking it again on September 10 until September 14, 2020. According to Defendant Cannataro, prescriptions, including Clindamycin are ordered and shipped from outside the JCDC. In addition, Defendant Haggard ordered the antibiotic Augmentin on September 13, 2020, which Plaintiff received on September 14, 2020. (Doc. 23-5 at ¶¶ 21-23).

During wound care on September 14, 2020, Defendant Adesina observed that Plaintiff had redness to his right foot, which she had not observed at prior wound care visits. Plaintiff told Defendant Adesina the redness had "just started suddenly." Defendant Adesina was concerned about cellulitis and notified Defendant Cannataro. (Doc. 23-8 at ¶ 9). Shortly thereafter, Defendant Cannataro went to the clinic to evaluate Plaintiff's foot and ordered him to be sent to the emergency room due to the drainage, swelling, and cellulitis extending above the ankle. (Doc. 23-5 at ¶ 25).

Plaintiff was admitted to the emergency room on September 14, 2020, for a great toe infection. Plaintiff had a consultation with the surgeon, podiatrist Dr. Timothy Friedrich, on September 15, 2020, at Riverside Medical Center. Dr. Friedrich's examination showed an ulcer to the medial or inside aspect of the great toe with some blistering, redness, and drainage, indicating infection. Plaintiff had palpable pulses, meaning good circulation, but his sensation was absent. Lab results showed an increased white blood cell count. An MRI of the right foot showed a collection of fluid in and around the toe, which indicated an abscess or infection, and bone marrow edema to the big toe, which indicated a possible bone infection. The findings were consistent with osteomyelitis, which is the clinical term for a bone infection. Osteomyelitis cannot be confirmed until the bone is seen or there is a culture or biopsy of the bone. (Doc. 23-11 at 15-21).

Dr. Friedrich operated on Plaintiff's right great toe on September 16, 2020. Upon seeing the bone, Dr. Friedrich determined the bone was infected and amputation was necessary. (Doc. 23-2 at 2-370; Doc. 23-11 at 25-26). The surgery was performed without complications. *Id.* at 25:15-18. Dr. Friedrich could not tell how long Plaintiff had the wound and infection prior to surgery. Regarding whether the bone infection came from the wound, Dr. Friedrich suspected that bacteria got in through the wound and caused the infection. *Id.* at 26-28.

Dr. Friedrich, who regularly treats diabetic patients, testified that diabetics are more susceptible to infection and ultimately toe amputation due to the vast majority of diabetics developing some loss of sensation to the feet, especially with long-term

8

uncontrolled diabetes. Additionally, diabetics take longer to heal due to high blood sugar causing calcification of blood vessels, which impedes circulation to the wounded areas. (Doc. 23-11 at 11-13).

*Plaintiff's Medical Care After Amputation*

Plaintiff was discharged from the hospital on September 18, 2020, and returned to the JCDC. Defendant Haggard followed Dr. Friedrich's recommendations to order Norvasc, Cefdinir, and Doxycycline. (Doc. 23-6 at ¶ 18). Defendants Ramos and Adesina provided daily wound care, including cleansing, antibiotics, and bandages. Plaintiff also received oral antibiotics. (Doc. 23-1 at 64-65; Doc. 23-8 at ¶ 12; Doc. 23-10 at ¶ 13). Each week, Dr. Friedrich treated Plaintiff at an outside wound clinic by evaluating the wound and providing wound care. (Doc. 23-1 at 65; Doc. 23-11 at 6-7, 33-37).

During wound care on December 13, 2020, Defendant Ramos observed that Plaintiff's right foot and calf was inflamed, red, and warm to the touch. The wound had a white and yellow border, which was not how the wound looked according to notes from the wound care performed on December 12, 2020. Defendant Ramos spoke to Defendant Cannataro, who ordered that Plaintiff be sent to the emergency room due to signs of possible infection. (Doc. 23-5 at ¶ 32; Doc. 23-10 at ¶ 14). Plaintiff was admitted to the emergency room on December 13, 2020.

Plaintiff had a consultation with Dr. Friedrich on December 15, 2020. Dr. Friedrich observed some redness to the amputation area, which had not healed yet. He concluded that Plaintiff had an ulcer and osteomyelitis at the first metatarsal of the great toe. Dr. Friedrich and Plaintiff discussed options of IV antibiotics versus further amputation or

9

debridement. Dr. Friedrich agreed to try antibiotics through a PICC line because Plaintiff's foot appeared stable. (Doc. 23-11 at 37-39).

Dr. Friedrich examined Plaintiff again on December 17, 2020, and saw the redness had improved and the antibiotics seemed to be working. Dr. Friedrich discharged Plaintiff with a PICC line to administer antibiotics through his arm. *Id.* at 40-41.

Defendants Adesina, Ramos, and Vasquez provided wound care to Plaintiff and administered antibiotics through his PICC line for six weeks. (Doc. 23-8 at ¶ 14; Doc. 23-9 at ¶ 5; Doc. 23-10 at ¶ 15). Daily wound care included dressing changes, cleansing of the wound with saline, and application of the debridement ointment Santyl, which promotes wound healing. Plaintiff also received regular wound care and evaluations with a surgeon at an outside wound clinic. (Doc. 23-5 at ¶ 34).

On January 27, 2021, Defendant Cannataro removed the PICC line from Plaintiff's right arm following completion of the IV antibiotics regimen. Plaintiff continued to have daily wound care at the JCDC after the PICC line was removed. (Doc. 23-5 at ¶ 35).

In Spring 2021, Plaintiff received further wound care and evaluations from Dr. Friedrich at the outside wound clinic. (Doc. 23-11 at 42).

Plaintiff's toe amputation site healed completely. According to Defendant Cannataro, it is not unusual for diabetics to experience slow wound healing. Due to Plaintiff's diabetes and surgical history, Defendant Cannataro ordered that Plaintiff have prophylactic dressing applications done three times a week to prevent pressure injury. (Doc. 23-5 at ¶ 36).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## DELIBERATE INDIFFERENCE STANDARD

A pre-trial detainee's deliberate indifference claim is analyzed under the Fourteenth Amendment's objective reasonableness inquiry. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018).

11

The court must conduct a two-step inquiry. First, the court must determine the nature of the defendant's intent and ask "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *McCann*, 909 F.3d at 886 (quoting *Miranda*, 900 F.3d at 353). Negligence or gross negligence does not meet this standard. *McCann*, 909 F.3d at 886. A plaintiff must show that the defendant "acted intentionally or recklessly – a more 'exacting standard' than that required to prove negligence." *Peters v. Young Sun Kim*, No. 15 CV 7236, 2018 WL 6398915, at *5 (N.D. Ill. Dec. 6, 2018). The required mental state is more than mere negligence but "less than subjective intent – something akin to reckless disregard" for the detainee's serious medical needs. *Id.*

Second, the court must determine whether the challenged conduct was objectively reasonable. *Miranda*, 900 F.3d at 354; *Williams v. Ortiz*, 937 F.3d 936, 942-43 (7th Cir. 2019). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively – without regard to any subjective belief held by the individual – whether the response was reasonable." *McCann*, 909 F.3d at 886. In other words, the plaintiff must demonstrate that (1) he suffered from an objectively serious medical condition and (2) the defendant's response to it was objectively unreasonable. *Williams*, 937 F.3d at 942-43 (citing *McCann*, 909 F.3d at 886).

## ANALYSIS

As an initial matter, the Court notes that Plaintiff failed to respond to Defendants' Statement of Facts in his Response. (Doc. 30). The Court's Local Rules provide that

12

"failure to respond to any numbered fact will be deemed an admission of the fact." CDIL-LR 7.1(D)(2)(b)(6).

"The Seventh Circuit has repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment, even in the case of *pro se* plaintiffs." *Sokoya v. Downey*, No. 06-2219, 2009 WL 773523, at *3 (C.D. Ill. Mar. 20, 2009) (citing *Moralis v. Flageole*, No. 06 C 2034, 2007 WL 2893652, at *1 (C.D. Ill. Sept. 28, 2007); *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed, ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.").

Given Plaintiff's failure to comply with the Local Rules, the Court deems Defendants' Statement of Facts admitted. *See Poole v. United States GAO*, 1 F. App'x 508, 510 (7th Cir. 2001); *Sokoya*, 2009 WL 773523, at *3. To the extent Plaintiff asserts facts within his personal knowledge, the Court will consider those additional facts for purposes of this Order. *See* Fed. R. Evid. 602.

## I.   Defendants Provided Constitutionally Adequate Medical Care.

Plaintiff alleges Defendants violated his Fourteenth Amendment rights because they delayed insulin for his diabetes and failed to provide appropriate medical care for a toe infection, which led to gangrene and an amputation. (Doc. 6 at 8).

Defendants do not dispute that Plaintiff suffered from an objectively serious medical condition. Defendants argue they are entitled to summary judgment because

13

they provided constitutionally adequate medical care, and Plaintiff has no evidence to support his assertions that a delay in receiving insulin and improper wound care caused his toe amputation. (Doc. 23).

### A. Plaintiff's Diabetes

Plaintiff alleges the amputation could have been avoided if there was no delay in receiving insulin when he was booked into the JCDC. Plaintiff claims it took ten days to receive injectable insulin and four days to receive oral medication, but his assertion regarding the receipt of injectable insulin is contradicted by his medical records.

Plaintiff arrived at the JCDC without his diabetes medication. Medical staff called Plaintiff's pharmacy to verify his prescriptions on August 25, 2020, but the pharmacy was closed. The JCDC had injectable insulin available for detainees to use, with the dose of insulin based on blood glucose level, until the detainee's prescription could be verified, ordered, and received. Additionally, medical staff created a diabetes mellitus sheet to log Plaintiff's blood sugar levels and provided instructions regarding insulin dosage and snacks to prevent low blood sugar.

On August 26, 2020, Plaintiff refused all blood sugar checks except for the 11:00 a.m. check. From August 27 to August 29, 2020, Plaintiff again refused all blood sugar checks except for the 11:00 a.m. check and received sliding scale insulin based on his blood glucose reading.

When Defendant Cannataro examined Plaintiff on August 28, 2020, he ordered insulin for Plaintiff, including Metformin 1000 mg, one tablet two times daily, and Novolog 70/30, 50 units in the morning and 20 units in the evening. Defendant Cannataro

examined Plaintiff's feet and observed 1 cm dry wounds to both great toes. There was no sign of infection, such as swelling, drainage, or warmth. Defendant Cannataro ordered Plaintiff to receive daily wound care from nursing staff and instructed Plaintiff to keep the wounds clean and dry.

On August 28, 2020, the nurse was able to reach Plaintiff's pharmacy and verified the prescriptions for Plaintiff's diabetes medication with the pharmacist. Plaintiff began receiving Metformin on August 29, 2020, and Novolog 70/30 on September 2, 2020. Although there was a delay in the receipt of Plaintiff's prescriptions, it is undisputed that the JCDC had insulin available for Plaintiff.

Plaintiff admits that his diabetes was uncontrolled when he arrived at the JCDC, and his blood sugar level improved during his detention. (Doc. 23-1 at 38:7-18, 71:10-12). While at the JCDC, Plaintiff has had chronic care follow up visits with an advanced care provider to monitor his diabetes, daily blood sugar checks, monthly weight checks, and A1c checks every three months. *Id.* at 35:24-38:3.

There is no verifiable medical evidence that the brief delay in the receipt of Plaintiff's prescriptions caused his toe infection and amputation. Dr. Friedrich testified that Plaintiff did not have gangrene in September 2020, and it was unlikely that a gap of several days in taking insulin would have made any difference in Plaintiff's risk of an infection. (Doc. 23-11 at 31-32).

Based on the undisputed material facts, no reasonable jury would find that Defendants were deliberately indifferent to Plaintiff's diabetes. *See Jones v. Kuenzli*, No. 20-cv-01528, 2022 WL 2757001, at *4-5 (S.D. Ind. July 14, 2022) (concluding that no

evidence in the summary judgment record established that the prison physician knew of a risk to plaintiff's health and safety based on alleged denial of glucose monitoring and insulin shots because the record reflected that plaintiff received diabetic care and that plaintiff was non-compliant and refused treatment). Therefore, summary judgment is granted in favor of Defendants on Plaintiff's claim regarding the delay in receiving insulin to treat his diabetes.

### B. Plaintiff's Wound Care

Plaintiff argues the JCDC medical staff intentionally and recklessly delayed medical attention for his infected toe, which resulted in an amputation. (Doc. 30). Defendants assert that they provided adequate care and Plaintiff has failed to offer any verifiable medical evidence that any delay in treatment caused him harm.

As an initial matter, the Court notes that Defendant Vasquez was not involved in treating Plaintiff until after his toe was amputated. Defendant Vasquez began providing treatment in December 2020. The relevant timeframe for this lawsuit is the period between Plaintiff's booking in August 2020 and his amputation in September 2020. As to Defendant Santiago, she did not provide any medical care related to Plaintiff's right great toe and his amputation; the allegations against Defendant Santiago were limited to the treatment of Plaintiff's diabetes. Therefore, summary judgment is granted in favor of Defendants Vasquez and Santiago. The Court will now consider Plaintiff's claim regarding the remaining Defendants – Cannataro, Haggard, Ramos, and Adesina.

Contrary to Plaintiff's allegations, Plaintiff's medical records demonstrate that he received consistent medical care for his toe wound. When he was booked at the JCDC,

16

his wound showed no signs of infection. Nevertheless, Defendant Cannataro ordered daily wound cleansing and dressing changes. On August 28, 2020, Defendant Adesina cleansed the wounds with saline, applied a new bandage, and advised Plaintiff to keep the area dry and clean. The wound on Plaintiff's left great toe healed shortly after he was booked at the JCDC, but the wound on the right great toe required further care. (Doc. 23-1 at 41-42).

During daily wound care on September 5, 2020, Defendant Ramos observed that Plaintiff's right great toe was red and inflamed. She consulted with Defendant Haggard, who prescribed the oral antibiotic Clindamycin.

During wound care on September 6, 2020, Defendant Ramos observed no drainage or bleeding. She cleansed the wound with normal saline and applied a new bandage. Defendant Ramos did not note any concerns regarding Plaintiff's condition.

Defendant Haggard ordered Tylenol 1,000 mg for Plaintiff on September 7, 2020, when he requested pain medication.

When Defendant Adesina performed daily wound care on September 8, 2020, she observed that Plaintiff's toe was red and swollen and scheduled an appointment with the advanced care provider for the next day.

During the follow up examination on September 9, 2020, Defendant Haggard noted that Plaintiff's toe was very red with whitish skin and yellow drainage. She entered a referral for wound care and for debridement at an outside clinic, which required USMS approval because Plaintiff was a federal detainee. She continued providing wound care

for Plaintiff at the JCDC clinic in the meantime. Defendant Haggard also ordered a uric acid test to check for gout.

On September 11, 2020, Defendant Adesina performed daily wound care and noted Plaintiff's toe had some redness and swelling, but no drainage.

On September 12, 2020, Defendant Ramos performed daily wound care and noticed that Plaintiff was not wearing his bandage. She cleansed the wound and applied a clean bandage and antibiotic ointment.

During daily wound care on September 13, 2020, Defendant Ramos observed that the toe had redness, inflammation, was warm to the touch, had skin peeling with white slough, and odor emanating from it, but no drainage. Defendant Ramos updated Defendant Haggard, who ordered the antibiotic Augmentin 825/125 to be taken twice daily for fourteen days. At this point, Plaintiff was still waiting for federal approval to see an outside wound care specialist.

During wound care on September 14, 2020, Defendant Adesina observed that Plaintiff had new redness to his right foot. Defendant Adesina was concerned about the spread of cellulitis, and she notified Defendant Cannataro immediately. Defendant Cannataro arrived shortly thereafter and ordered Plaintiff to be sent to the emergency room.

At the hospital, Plaintiff was examined by a podiatrist, Dr. Friedrich, who noted an ulcer on the medial or inside aspect of the great toe with some blistering, redness, and drainage, indicating infection. Lab results and an MRI revealed possible osteomyelitis, which cannot be confirmed until the bone is seen or there is a culture or biopsy of the

bone. Dr. Friedrich told Plaintiff that he would need an incision and drainage and possibly amputation. When Dr. Friedrich operated on Plaintiff on September 16, 2020, he concluded after visualizing the area that the bone was infected and amputation was necessary.

Seventh Circuit precedent requires examination of the totality of a detainee's care when determining whether the treatment provided was inadequate. *McCann*, 909 F.3d at 886. Based on the totality of the facts and circumstances Defendants faced, the Court finds that the treatment they provided to Plaintiff was reasonable. Specifically, the medical records demonstrate that Plaintiff received daily wound care; was given antibiotics and pain medication; was referred to an outside provider; and was immediately taken to the hospital when the infection suddenly progressed.

The fact that Plaintiff's toe needed to be amputated does not mean that the care Defendants provided was inadequate. A bad medical outcome is not proof of deliberate indifference. For instance, in *Redmond v. Kosinski*, an inmate sued prison medical providers alleging that they violated his Eighth Amendment rights when they delayed proper treatment for a sore on his right foot, which resulted in below-the-knee amputation. 999 F.3d 1116, 1118-19 (8th Cir. 2021). The court held that his medical condition, a complex medical situation involving diabetes, hepatitis, and infected wounds, presented a sophisticated medical question that required the plaintiff to present medical evidence, such as expert testimony, to prove causation. *Id.* at 1120.

The court noted that the medical condition could be treated with a variety of medications and procedures, providers might make different decisions regarding

treatment, and patients have varying outcomes. *Id.* at 1120-21. As such, a layperson would not be able to determine whether a medical provider's alleged actions or inactions were grossly incompetent or inadequate without medical evidence. *Id.* at 1121. The appellate court affirmed summary judgment in favor of the defendants and found that the plaintiff's unsupported medical conclusions could not create a question of fact to defeat summary judgment. *Id.*

Similarly, Plaintiff, who has no medical training, asserts that the delay in receiving outside care caused his condition to deteriorate and led to amputation. Plaintiff claims that although Defendant Haggard referred him to an outside provider for wound care on September 9, 2020, he was forced to wait six additional days before going to the hospital because the USMS had to approve the request. (Doc. 30 at 3-5).

In cases where medical treatment was allegedly delayed rather than denied, the plaintiff must provide verifying medical evidence to show the detrimental effect of the delay on the medical condition. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Here, Plaintiff has provided no verifiable medical evidence to show that the delay in seeing an outside provider caused the amputation. The Court finds that Defendants were not deliberately indifferent by awaiting USMS approval for outside medical treatment because they continued to provide daily wound care and antibiotics. When Defendant Adesina observed new redness to Plaintiff's right foot on September 14, 2020, she informed Defendant Cannataro, who immediately sent Plaintiff to the emergency room. Prior to September 14, 2020, there was no indication that emergency medical care was needed.

Finally, Plaintiff asserts, without evidentiary basis, that the Kankakee County Sheriff and the JCDC medical staff have a "culture of nefarious profiteering," and that as a federal detainee, he received differential treatment due to the involvement of the USMS in approving and paying for the cost of his medical care. (Doc. 30 at 1). The arguments Plaintiff asserts in his Response are akin to an Equal Protection claim and a *Monell* claim; however, Plaintiff did not include these claims in his complaint, nor did the Court grant Plaintiff leave to proceed on such claims. (Docs. 1 and 6).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment deliberate indifference claim.

## II.   Defendants are Entitled to Qualified Immunity.

Alternatively, Defendants argue they are entitled to qualified immunity. Even if Plaintiff had established a constitutional violation, the Court finds that Defendants are entitled to qualified immunity. Qualified immunity "provides defendants immunity from suit, not just a defense to liability." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Even though qualified immunity "is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Id*. Qualified immunity shields a public official unless the plaintiff can demonstrate that (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Gerhartz v. Richert*, 779 F.3d 682, 688 (7th Cir. 2015).

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)). Qualified immunity cannot be defeated merely by "alleging [a] violation of extremely abstract rights" or by defining the right in question "at a high level of generality." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). Instead, "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019). The question is whether it is clearly established that the particular conduct of the officer violated the plaintiff's constitutional right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). Stated differently, the "crucial question" is whether the official "acted reasonably in the particular circumstances that he or she faced." *Kemp*, 877 F.3d at 351.

To show that a right is "clearly established," the plaintiff must demonstrate that "closely analogous" caselaw or precedent finds the alleged violation unlawful. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). The plaintiff does not have to "point to an identical case, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Mullenix*, 577 U.S. at 11); *see also Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) ("The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'"). In rare cases, a plaintiff can show a right is clearly established without providing caselaw or precedent by "proving that the defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Reed*, 906 F.3d at 547.

22

Here, Plaintiff has failed to demonstrate that the extensive medical care he received violated any clearly established constitutional right. There is no closely analogous case that would have given Defendants fair warning that their conduct amounted to a constitutional violation. Accordingly, Defendants are entitled to qualified immunity.

**IT IS THEREFORE ORDERED:**

(1)    Defendants' Motion for Summary Judgment [23] is GRANTED. This action is DISMISSED WITH PREJUDICE. Plaintiff takes nothing. The parties will bear their own costs. The Clerk is directed to enter judgment and close this case.

(2)    If Plaintiff wishes to appeal this judgment, he must file a Notice of Appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

(3)    To proceed *in forma pauperis* on appeal, Plaintiff must file a Motion for Leave to Proceed on Appeal *in forma pauperis* and identify the issues he will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:  9/21/23

s/ James E. Shadid
James E. Shadid
United States District Judge